## J. T. MORRIS V. THE STATE.

*No. 7505.    Decided June 24.*

30   95
37   265
37   365

1. **Arraignment.**—The Code of Criminal Procedure does not prescribe the exact time in the order of proceedings in a capital case at which the defendant shall be arraigned. It has been held, however, that the arraignment should precede the trial proper, but a conviction will not be set aside on appeal because the arraignment was at an improper time.

2. **Juror, Competency of.**—O being examined as to his qualifications as a juror, stated that he had formed an opinion as to the guilt or innocence of the defendant; that he formed such opinion soon after the homicide, and still entertained the same opinion; that it would take evidence to remove that opinion; that said opinion was not a fixed one; that he had heard no one speak of the case who purported to know or state the facts; that all he knew about the case was from rumor; that he could try the case and decide it upon the evidence that might be adduced on the trial, and could entirely discard the opinion he had formed, and would not be influenced by such opinion to any extent. *Held,* the juror was competent, and the court did not err in overruling defendant's challenge for cause.

3. **Evidence—Examination of Witness.**—The rule of the common law which confines the cross-examination of a witness to matters inquired about on his examination in chief, or to matters in rebuttal to his cross-examination, does not obtain in this State. The common law rule is practically and entirely abrogated by that provision of our Code of Criminal Procedure which authorizes the court to admit testimony at any time before the argument is concluded, if it appear that it is necessary to a due administration of justice. The exercise of such discretion by the trial court will not be revised unless it plainly appears to have been abused.

4. **Evidence — Expert Testimony.** — P, a witness for the State, was permitted over the objections of defendant to testify as to the condition of the dead body when found, the wounds upon it, and that the wounds appeared to have been inflicted with a shotgun and a rifle. *Held,* the matters testified about were not matters of skill demanding the testimony of an expert. It does not require the testimony of an expert to tell that a dead body is in an advanced state of decomposition, nor that the wounds upon it were made with a shotgun and a rifle, where it is shown that the witness is familiar with such firearms. It was not error to admit such evidence.

5. **Evidence — Relevancy.**—B, a witness for the State, was permitted to testify over defendant's objection about the finding, etc., of another dead body several miles distant from the supposed dead body of Roberts. It appears from other evidence in the case that defendant, Roberts, and one Moss were traveling together; that Roberts and Moss disappeared at the same time. This testimony was admitted by the trial

judge for the purpose of identifying said other dead body as that of Moss. *Held*, the testimony was admissible to show motive, knowledge, and intent on the part of the defendant, and also as a circumstance developing the *res gestæ* of the transaction under investigation.

6. Same.—P, a witness for the State, testified over defendant's objection to finding a watch in a well some months after the murder. *Held*, this testimony was admissible in connection with other evidence proving that on the day of his arrest for the murder the defendant had access to the well and could have thrown the watch into it, and that the watch found was the property of Roberts, the deceased.

7. Same.—A letter purporting to be from the deceased Roberts to defendant, asking him to take care of his (deceased's) property, was admitted in evidence over defendant's objection. This letter was taken from the defendant's possession and was proved to be in his handwriting. *Held*, it was properly admitted in evidence as a fact tending to show defendant's guilt.

8. Same.—Over defendant's objections the contents of a trunk, which trunk had been in his possession and was found in his room after his arrest, were admitted in evidence. The articles found in the trunk and produced in evidence were identified as property belonging to the deceased Roberts and to his traveling companion Moss. *Held*, this evidence was admissible, as it tended to show the motive and fruits of the crime, and constituted a link in the chain of circumstances establishing defendant's guilt.

9. **Special Venire, Service of Copy of.**—A true copy of the names of the persons summoned on the special venire was served upon defendant more than one day prior to the trial. *Held*, that defendant's objection to such service was without merit.

10. **Judgment Nunc pro Tunc.**—At the term of the court at which the conviction was had there was a failure to enter the judgment of the court upon the minutes. Defendant gave notice of appeal at that term of the court, and a transcript of the case was made out and forwarded to the Court of Appeals. At the next term of the trial court, and pending the appeal, the district attorney moved the court to enter a judgment *nunc pro tunc* upon the verdict. Notice of this motion was served upon defendant more than three days before it was acted upon, and he controverted said motion. The motion was granted, and a judgment *nunc pro tunc* was entered upon the verdict. *Held*, that this proceeding was without error.

11. **Murder in the First Degree.**—See statement of the case for circumstantial evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Hardeman, on change of venue from Greer. Tried below before Hon. G. A. Brown.

The following is the evidence in the case in full, as contained in the statement of facts in the record:

Witness Wright testified, that he knew the defendant J. T. Morris, and pointed him out in court. That he first saw him in the Greer County Wagon Yard in Vernon, Texas, about the middle of April last. Did not know either J. M. Moss or W. E. Roberts. Defendant brought a team of horses and wagon and a dun pony to the wagon yard. The team was a span of large gray horses. The wagon was covered, with the sheet tied down very close. After defendant was arrested I took the things out of the wagon. There was blood on the sideboard and bottom of the wagon bed. It looked like the blood on the sideboard had been scraped off. I saw this same wagon and team and pony leave

Vernon about one week before.   Did not know who nor how many
were in the wagon.

C. C. Carson testified:   I live in Wilbarger County and run a brick
yard in Vernon.   Knew defendant J. T. Morris; also knew W. E. Rob-
erts and J. M. Moss.   First knew them in February, 1890, when they
worked on the brick yard.   I saw them all at the brick yard on the 5th
day of last April.   They were preparing to make a trip to some west-
ern county.   I did not see them start.   I left Vernon on that day, and
they were to leave on the next.   J. M. Moss owned a span of large gray
horses and a shotgun.   W. E. Roberts owned a small dun pony and a
wagon and a 32-caliber Winchester gun.   Moss carried a heavy hunt-
ing-case silver watch, and Roberts a small silver watch.   Witness could
not identify the watch.   Saw the team and wagon and pony in charge
of defendant at a water tank near Chillicothe, Hardeman County, Texas.
Drove up to wagon and spoke to defendant.   He got out of the wagon
on opposite side from witness, and seemed excited and confused, and
started to walk off in an opposite direction; then turned round several
times and placed his hand on the wagon wheel, but finally came back,
stepped across the wagon tongue, and shook hands with witness.   Wit-
ness then asked him where the boys were (meaning Moss and Roberts).
Defendant replied that he had left them in Quanah.

C. M. Cox testified, that he knew defendant J. T. Morris, also W. E.
Roberts and J. M. Moss.   They all worked at a brick yard at Vernon
up to about the 1st of April of this year.   Saw them start to Greer
County.   They worked Moss' gray horses to Roberts' wagon and led
Roberts' dun pony behind the wagon.   They took an outfit of bedding
and cooking utensils, a shotgun and a 32-caliber Winchester.   Moss
owned the bedding and shotgun, and Roberts owned the cooking uten-
sils and Winchester.   Have not seen J. M. Moss or W. E. Roberts since
they started to Greer County.

J. A. Powers testified:   I met three men near the school house in
Mangum, Greer County, Texas, about the first of last April.   They
were driving a team of gray horses.   The larger of the three men was
driving.   They stopped and I talked with them for some time.   De-
fendant was one of the three men.   One of them said he was from
Dallas County and one of them said he was from Falls County.   The
driver had his foot on the dashboard, and I noticed that he wore a
large shoe that was made to lace, but that the string was gone and the
shoe was open.   They made inquiries about a man that lived some-
where on Salt Fork.   The shoe that the man who was driving the
wagon wore was an old shoe and about half worn.   Witness saw a shoe
he took to be the same shoe in Mangum the day the two dead bodies were
taken there.   It was brought in by the party with some other things.
When defendant was brought back to Mangum by the officers he ap-
peared to be greatly excited and wanted to talk.   Witness told him to

wait and not be excited; that he could talk after a while.   The officers took him out of the wagon.   He was so excited he had to be lifted and carried from the wagon.   After he was taken from the wagon and became somewhat quiet and over his excitement, witness told him that he could talk if he wanted to, but that what he said could be used as evidence against him on the trial.   I am a lawyer and gave defendant the statutory warning.   Witness then asked defendant if he remembered seeing him near the school house in Mangum about a week previous to that time.   Defendant replied that he did.   Witness then asked him where they went to.   Defendant replied they went up Elm Creek Wednesday and camped that night somewhere on that creek; that on the next day they went over on Salt Fork and camped there Thursday night near a house on that stream.   He said that there were two men with him, J. M. Moss and W. E. Roberts.   Witness then asked him if they went to old man Murfree's.   Defendant replied that he and Roberts went to Murfree's house, and that the next morning they drove a few miles toward Quanah and stopped, and he and Roberts went hunting up Salt Fork; that after dinner they drove on toward Quanah; that they passed a well near a creek, where he got a jug of water; that there was a lady near the well.   Witness told him that the lady said there was but one man with the wagon, and asked him where Moss and Roberts were.   The defendant studied a while, and replied that Moss and Roberts had got out of the wagon and gone antelope hunting across the ridge to shoot at some antelope, and came back to the wagon after he passed the well; that they crossed a creek just after they passed the well and drove on to the next creek and camped for the night; that a man named Simpson, an acquaintance of Roberts, came up in a wagon and camped with them; that Simpson insisted on them going back to Salt Fork, Elm Creek, and look at some land they had not seen; that next morning Roberts and Moss turned back with Simpson to look at the land and sent him with the team to Vernon, stating that they would be on as soon as they looked at the land; that he came to Quanah that night and went from there to Vernon the next day.   Defendant stated that Roberts had on a white hat and that Moss had on ducking pants. Defendant described the clothing on Roberts and Moss, and that description compared accurately with the clothing on the dead men respectively as described by defendant.   Witness was present when the dead body in the ravine on Salt Fork was taken up.   This was about sixteen miles west of Mangum and about three miles west of old man Murfree's place.   The dead body had on a black vest and grayish pants.   When defendant was brought back to Mangum he had on a coat that corresponded with the vest on the dead man in the ravine. Defendant said he bought the coat with a suit of clothes at Whitewright, in Grayson County.   Witness then asked if he had ever loaned it.   He said no.   Witness then asked him how came the hole in the

back.  He said there was no hole in the back.  Witness then showed him a hole in the back.  Defendant seemed surprised and excited, and said he must have burnt it.  Witness stated that the hole in the coat was about the size of a 32-caliber Winchester ball.  Witness stated that the clothing on the dead body in the ravine corresponded with description of the clothing worn by Roberts as given by the defendant; that after they took up the dead body in the ravine they went to the dead body found near the Quanah road.  The body was about thirty or forty yards from the road in a small gully in the sand ridges, and about four or five miles from old man Murfree's, and about five or six miles from the dead body in the ravine.  Witness did not pay much attention to the clothing on the dead body found in the sand hills, as the examination of the other dead body had made him sick.  Witness here identified the coat worn by defendant, but said it was dirtier from having been in the sack with the clothes taken off of the dead men.  The hole in the lining of the coat is a little higher than the hole in the outside.  The body in the ravine had on no coat.  Witness here identified the vest taken from the body in the ravine by the collar having been burnt.  Witness pointed out a hole in the back of the vest, and said it corresponded with the hole in the back of the dead man.  Witness here identified the shirt as that taken from the body of the dead man in the ravine, and pointed out the hole and said it corresponded with the hole in the vest and in the back of the dead man.  Witness then identified a shoe as being the shoe taken from the dead man found in the sand hills, and said it looked like the shoe on the man driving the wagon near the school house in Mangum.  Witness said the general appearance of the two dead men corresponded with the general appearance of the two men he saw with defendant in the wagon near the school house in Mangum.  The driver was about 28 or 30 years old, and was a large, heavy set man.  The other man was smaller than either the driver or defendant.  The pockets of the pants of the man found in the ravine were turned wrong side out.

Cross-examined by defendant:  The hole in the back of the vest and shirt corresponded with each other and with the hole in the dead body, and was about the center of the back.  The hole in the coat worn by the defendant was about six or eight inches lower, and about three inches to the left of the hole in the back of the dead body and the hole in the shirt and vest taken off of the dead body.  Witness saw no blood or stain on the coat, and the coat did not have the appearance of having been washed.  The defendant had on a vest like the coat, but the coat was better preserved than the vest.  The vest that the defendant has now on appears to be the same vest defendant had on with the coat at Mangum when his attention was called to the hole in the back of the coat, and the vest of the defendant appears to be better preserved than the vest taken from the dead body in the ravine.  Witness identified

the coat taken from the dead body taken from the sand hills, and says that it corresponds in color and texture very well with the vest taken from the dead body in the ravine, and appears to have been worn about the same length of time; that the dead body found in the ravine appeared to be a smaller man than the defendant, and the dead body in the sand hills appeared to be a larger man than the defendant. The defendant here put on a coat identified by witness as being the one worn by the defendant at Mangum, and witness stated that it fit the defendant. Witness stated that he was not a physician or a surgeon, and not a judge of wounds more than ordinary men.

Redirect: Witness was asked by the district attorney in what condition the body found in the ravine or ditch was when he found it and the character of the wound on the body. Witness answered, the right jaw was blown off or turned back as if it had been shot with a shotgun, and had the appearance of having been made with a shotgun; that the wound in the back was made with a 32-caliber Winchester bullet, and the arm was broken, and there was a hole through the arm about the size of a 32 Winchester ball; that witness was not present when either of these wounds was made.

Mr. Byers testified as follows: Witness lives at Mangum, in Greer County, and is deputy sheriff of that county. First saw defendant between Frazier and Vernon in the first part of April. He was in a two-horse wagon. The horses were a large gray and a roan; had a led horse behind the wagon. There were four men in the crowd. Next saw defendant at Mangum after he was arrested. Saw same gray team and led horse. E. R. Fletcher and Judge Duke had charge of the defendant and the team. One of the horses was branded O O and the other one was branded C. Witness went up in the Salt Fork country last April and found two dead men. The first dead body was four or five miles from Mr. Murfree's. This body was in the sand hills; was lying in a little gully and partly covered with sand; was about seventy-six yards from the Quanah road. Witness examined same clothes and recognized them as the clothes found on the dead body. He had had them in his possession since they were taken from the body. The black hat was brought in with the same bloody bedding that was found before the bodies were found. We took up the dead bodies on Friday. The first one we took up was near Salt Fork, in the bottom of a ravine. This body was covered with dirt except the head and one arm, and was about five miles west from old man Murfree's. Could see finger prints of a man on the bank of the ravine where the tuft of grass and sand was pulled down to cover the body with. [Witness here picked out and identified the clothes that were taken from the body found in the ravine.] Saw trunk at Mangum that was said to belong to W. E. Roberts that had clothing in it. One shirt in the trunk matched the shirt on the dead body in the ravine on Salt Fork. Also a pair of blue

socks just like the socks on the feet of the dead body. Heard the defendant talk a good deal. Mr. Powers had warned him that his statements might be used in evidence against him. There was a considerable crowd gathered around, but if there was any threats of lynching I did not hear them. There were threats of lynching made after this. Immediately after being warned by Powers the defendant said that he, Moss, and Roberts had come up through Greer County on a hunt; that they went up on Salt Fork, and camped at Murfree's; that they then traveled together toward Quanah till near night and camped south of Turkey Creek with a man named Simpson, who knew Roberts; that next morning Roberts and Moss went back with Simpson to look at a section of land, and defendant went on to Vernon to get a load of wire; that defendant and Roberts went turkey hunting up Salt Fork, near Murfree's; that Moss drove the wagon on down the road; that when he and Roberts came back to the wagon they hitched up and drove on down the road, where they camped that night.

Cross-examined by defendant: Defendant said that the night before they camped at Murfree's they camped on Elm Creek. The defendant gave a description of the man Simpson, but witness did not pay much attention to it and did not recollect the description given. Defendant said he went to Vernon after wire and some other tricks, but did not recollect whether he stated that Moss and Roberts were to come on down to Vernon and go back with him or not. Witness said the body in the ravine was five miles from any public road, and the body in the sand hills was seventy-six yards from the road and could have been plainly seen if it had not been partly covered with sand, and that when witness turned out of the road he could see the uncovered part of the body. This road was a plain road and was traveled more or less. There had been travel on it not long before the body was found. The body on the Quanah road in the sand hills was found first. It was found on Tuesday evening, and the second body was found in the ravine on Salt Fork the following Friday. It rained on Monday night before the first body was found. Witness here picked out and identified the coat and vest taken from the large body found in the sand hills and the vest and shirt taken from the body in the ravine on Salt Fork, and the coat taken from the defendant at Mangum, and examined the vest then worn by defendant, and made the same statements with reference to them as did the witness Powers, except that defendant did not put on the coat and witness did not testify as to the coat fitting the defendant.

Redirect: The man in the ditch was lying on his back with his head to the north. The right side of his head or jaw seemed to be shattered. The hole in the shirt and vest corresponded with the hole in the back of the dead body. Don't know whether it was a bullet hole in the body or not. Witness was asked by the district attorney to describe the

body of the dead man found in the sand hills. Witness answered that the body was in an advanced stage of decomposition and very much swollen, and that it would be hard to tell what kind of a man he was when alive; that he looked to be a large man about six feet high, and would weigh perhaps 200 pounds. Had dark hair and wore ducking overalls.

S. C. Vanleer testified: I live in Mangum, Greer County, Texas. First saw defendant in the latter part of March or first part of April, ·1890. Defendant came to witness' store to buy 32-caliber Winchester cartridges. Witness did not have the cartridges, but told defendant that he thought he could get them at Leeds. Defendant then bought some powder and shot. There was another man with him. Saw them at the wagon. Had a large gray team and a dun pony tied behind the wagon. The other man left defendant at witness' store and went to another store to get cartridges.

R. E. Fletcher testified: I live in Greer County. Am justice of the peace of Precinct No. 1 of said county. First saw defendant in Vernon about the 19th day of April, 1890. He was under arrest. Had a conversation with the defendant. He was warned immediately before this conversation. Witness told him to be careful in making his statements, as what he said might be used against him and not for him. Defendant was under the impression that we had him for stealing horses, but I told him that we had him for murder. Witness then detailed to him how they had discovered the dead body in the sand hills and the bloody bedding and the hat with the bullet hole in it. Defendant said that he went up through Greer County with W. E. Roberts and J. M. Moss, and camped on Thursday night near a house on Salt Fork. Drove on the next day to the first creek north of Red River and camped for the night. That there they met a man named Simpson, who was acquainted with Roberts; that next morning Roberts and Moss went back with Simpson to look at a section of land that Simpson knew of. Defendant came on to Quanah and went from there to Vernon, where he was to take care of the team until the boys returned. Defendant exclaimed, "How can they think that I did the killing? We were good friends." Defendant said that he and Roberts went hunting and killed a turkey or two. He made this last statement with reference to killing the turkeys the morning we held the inquest over the dead bodies found in the ravine. Defendant said that he had a trunk at Naylor's, in Vernon. Said he had some silver and a check in the trunk; that the check belonged to W. E. Roberts; that W. E. Roberts told him that he could cash the check and take his money out of it—$45; that after making last statement defendant said Roberts told him he could sell the dun pony and pay himself. Defendant was led up to the dead body in the ravine and asked if that was Roberts' body. He replied that he thought that it was Roberts' body. Then he exclaimed, "My Lord,

how could anybody think that I did such a thing as that?" Witness had taken a course of study in bookkeeping; had taught writing school; had kept books; was acquainted with different handwritings, and was at the date of giving this testimony one of the board of school examiners of Greer County; that he had seen the defendant write and knew his handwriting. He was then handed the letter, and after examining the same said, "I will state that to the best of my knowledge and belief this is in the handwriting of the defendant and that it is his handwriting." The State then introduced the letter as follows:

"*Mr. J. T. Morris:*                              "Quanah, Texas.

. "Dear Friend—If you will take care of our team and things John and I will go back over there with Simpson. He is going to go in the morning, and John wanted to look around some more before we bought. Will you take care of everything till we get back, and we will pay you for it. Yours, from
                                                  "W. E. Roberts.

"Jim, you put my pony in a pasture. We will be back in a few days."

Witness was with defendant when they carried him from Vernon to Mangum. They did not try to scare him as they were carrying him back. After the bloody bedding and the hat with the hole in it had been found, there was a party went to search and see if somebody had not been killed, and we struck the track of a wagon where somebody had camped near old man Murfree's, on Salt Fork, and the track of a pair of large horses near the residence of old man Murfree on the Quanah road. We followed this on toward Quanah, three or three and a half miles, when it left the road, and about fifty or sixty yards from the road it passed within from seven to ten feet of the body found in the sand hills. The track then turned back into the road, and we followed it about three or four miles, where it again left the road and passed within eight or ten feet of where the bloody bedding and the hat with the hole it were found in the ravine. The track then turned back into the road, and we followed it to Turkey Creek in the direction of Quanah, when it became so dark that we could not follow the track. Witness then went on to Quanah and from there to Vernon, where he found the defendant under arrest. Witness saw red striped corn and some oats at the place where the body was found in the sand hills, and saw the same character of corn and oats at a camp near Mr. Murfree's house, and at the place where the bloody bedding and hat were found, and saw some of the same kind of corn and oats in the wagon found in possession of and controlled by defendant in Vernon. Witness identified a black hat that was found with the bloody bedding; said that the hole in the hat was about the size of a 32-caliber ball. There was a

hole in the right side of the head of the body found in the sand hills that corresponded with the hole in the hat.

J. T. Conn testified for the State: I reside in and am sheriff of Wilbarger County. Know the defendant, and pointed him out in court. Took charge of the defendant soon after he was arrested in Greer County Wagon Yard in Vernon. As I was taking him to the jail I found a letter on his person which I read and gave to some of the Greer County officers present; do not remember who. [The district attorney here showed witness a letter.] Witness said it was the same words as the letter taken from the defendant, but could not say that it was the same writing or the same paper, but that it had the appearance of being the same writing and paper, and that he believed it was the same writing and paper. Did not remember in whose custody he placed the letter taken from defendant, and did not know who had had the custody of the paper offered in evidence. The letter here referred to was the same set out in E. R. Fletcher's testimony. Defendant was under the impression that he was arrested for horse theft, and I did not tell him any better, just let him believe it; but warned him that any statement he might make could be used against him and not for him. Defendant said that the horses in his charge did not belong to him, and started to tell where the parties they belonged to were. Witness told him that he was pretty lucky to get to go to jail. Defendant said that the owners of the horses would be in soon and would vindicate him. Said that they went back into Greer County with a man named Simpson; that Simpson was an old acquaintance of Roberts; that they turned back about a mile north of Quanah. Witness examined the wagon and team brought by defendant to the wagon yard. There were three horses—two grays and a dun pony. There were two trunks in the wagon found in Greer County Wagon Yard. There were letters in one trunk addressed to W. E. Roberts and in the other letters addressed to Moss. There was a saddle, some bedding, and some cooking utensils in the wagon. There was blood on the side and in the bottom of the wagon. It had the appearance of having been rubbed or scraped with some sharp instrument. There was also a 32-caliber Winchester rifle in the wagon. There was a letter in one of the trunks addressed to Roberts' sister, who was going to get married.

William Murfree, Sr., testified: Saw defendant in Greer County about the 10th of April. He was at my house on Salt Fork, about ten or twelve miles west of Mangum. There were two men with him. They had a span of large gray horses, about fifteen hands, and a small dun pony. They camped about seventy yards from my house about three o'clock on Thursday evening. I was plowing in the field at the time and saw them. The defendant and one of the men went hunting. I went to the camp to get one of my horses that was bothering at the camp. I talked with the man. He said he was from Ellis County.

He complained of being sick. He was a large man and wore ducking pants. They left my house on Friday morning and started north on the Quanah road. When I was eating dinner on Friday I saw the defendant about six hundred yards south of my house. He was traveling east and in the direction from the body found in the ravine. Had his gun in a position as though he was creeping on something. He had something else in his hands, which looked like a bird sack. The defendant was going east when I first saw him. He then turned south, took the Quanah road, and went on the way the wagon had gone in the morning. Witness stated that on Tuesday after they had camped at his house on Friday, and after the bloody bedding and the hat with the hole in it had been found, he started out with Bill Hughes and others to hunt the country out to see if somebody had not been killed; that they took the track of a wagon at the camp where he saw the parties camped near his house with the gray team, dun pony, and wagon on Salt Fork, on the sand hills of Salt Fork, drawn by a span of horses making a large track, near his house; that they followed the track about three or four miles, when it left the road; they then smelled something and began to look around, and discovered the body about seventy yards from the road; that they then followed the tracks and found that the wagon tracks and large horse tracks passed within eight feet of the body of the dead man. He then found where a pony track had left the wagon and gone off ten or fifteen steps; that a man's track approached the pony track, and that the man's track and pony track returned to the wagon track. He also found a piece of cotton rope about two feet long at this point, which resembled a cotton rope which the dun pony was tied with the night the party camped at his house. We followed the tracks from the dead body back to the Quanah road and followed them on the road about three or four miles, when the tracks turned out of the road again to where the bloody bedding and the hat with the hole in it were found. There had been no travel on the Quanah road from Friday until Tuesday, the day the body was found, except one light buggy which had gone down the road toward Quanah and returned. We followed the tracks of the horses in trailing, as the wagon tracks had been put out by the buggy tracks, and the horse tracks never left the road from the point where they first found them near the witness' house until they turned out of the road near where the dead body was found. Witness saw red striped corn and some oats on the ground near where the dead body had been found, and also saw same kind of corn and oats at the place where the bloody bedding had been found, and saw the same kind of corn and oats scattered on the ground at the camp where the parties camped on Friday night near witness' house. Witness here identified the vest taken off the dead body in the ravine on Salt Fork, also the ducking pants taken

off the dead body in the sand hills. The ducking pants looked like the ducking pants worn by the large man with the wagon.

Cross-examined by defendant: The large man found in the sand hills resembled the large man with the wagon. The man found in the sand hills was three or four miles east of witness' house, and the man found in the ravine was about two miles west of his house.

W. A. Hughes testified: I live on Turkey Creek, in Greer County. I was on Salt Fork the 10th or 15th of April last, looking for a man that was reputed to have been murdered. There were eight or ten of us started out from Turkey Creek together. We traveled up the Quanah and Salt Fork road to old man Murfree's house. There was a part of us in the road all the time and part was out looking over the country for the body. We started out and looked in the locality we did because there had been some quilts and blankets and a mattress found by myself near that road with blood on them. There was also a hat, with a bullet hole and clotted blood and what the witness took to be brains in it. After the party reached old man Murfree's witness went to Mangum and got some other men and returned to Murfree's. This was on Monday. On Tuesday morning we started out from old man Murfree's to continue the search. There were some ten or fifteen of us, on horseback and in hacks. We struck the track of two large horses and a wagon near old man Murfree's house and followed them down the road to where they turned out to where the body was found in the sand hills. Witness went down to within a few feet of where the bedding was found, and found similar tracks to those on the road trailed from Murfree's to the dead body.

Cross-examined: It rained a little between Friday night and the time the body was found on Tuesday. First saw the bedding in a little hollow two or two and a half miles north of Turkey Creek, near the Salt Fork and Quanah road. I was not the first one to the dead body found in the sand hills. Judge Duke and two or three others who were in the hack were at the body when I got to it. I came up in a very few minutes after it was found. One of the blankets found with the bedding appeared to have been used to wipe up blood with, and there was some striped corn and oats at the place and on said blanket.

Jim Ellison testified: Live in Mangum, Greer County, Texas. Have lived in Greer County eight years. Am constable of Precinct No. 1. Saw defendant in April, 1890, four or five miles southeast from Mangum. There were two other men with him. They drove two large gray horses and had a dun pony mare tied behind the wagon. I was where the dead body was found in the ravine on Salt Fork. Saw footprints about four or five feet from the dead body. Measured the footprints and afterward measured the feet and footprints of the defendant, and the footprints and the feet of defendant compared exactly in

length and width with the footprints found at the dead body, and right at the dead body.

W. T. Murfree, Jr., testified: I lived in Greer County last April. Saw defendant on the 10th or 12th of last April in Greer County. He and two other men camped near by father's house. They had a gray team and a led horse. [Witness here identified the white hat as being the hat worn by one of the men that were with the defendant.] First saw the hat on the man at Frazier, in Greer County, in March. When I met him at my father's house I recognized him by his hat. This hat was next seen by me at the place where the dead man was found in the ravine, two miles west from my father's house.

T. G. Cooper testified for the State: I live on Turkey Creek, in Greer County, about twelve miles from William Murfree's, Sr. Saw defendant in Mangum last spring under arrest. On the 10th or 11th of April last, on Friday, I was traveling on the Salt Fork and Quanah road and I saw a wagon and a span of large gray horses and a dun pony. The gray horses were hobbled out; the dun pony was staked, and there was a man lying under the wagon apparently asleep. I spoke to him, but he made no answer. This was about a mile and a half of William Murfree's, Sr., and between Murfree's and where the dead man was found in the sand hills.

T. L. Deavers testified: I live in Greer County. Saw defendant at Mangum last court. I saw a gray team between the 5th and 15th of April last between Salt Fork and old man Murfree's, on the Quanah and Salt Fork road. There was one man with the team. He asked me the way to Quanah. Can't say whether that was the defendant or not.

John Taylor testified: Witness identified a white hat as a hat that was found under the root of a cottonwood tree six or eight feet from where the man in the ravine was found. The ravine was eight or ten feet deep. I was with the party that found the body. The body was all covered except the left arm and head and his face and the toe of one shoe. There was a small trail came up from the ravine about fifty yards below the body and passed along up the bank of the ravine about fifteen feet from the body. There was a little gully run down from the trail near where the body was found. I found a 32-caliber Winchester cartridge and two No. 10 brass shells for shotgun. They were all loaded, and near the path and the head of the gully that runs down into the ravine where the body was. There was a bunch of grass which had been burnt about three feet from where the cartridges were found, and something heavy had been dragged from where the grass was burnt down into the ravine where the body was found. I saw defendant on Friday morning in camp about 150 yards from Murfree's house. There were two other men with him. I saw a dead body in the sand hills about five miles south of old man Murfree's, near the

Salt Fork and Quanah road, which I recognized as one of the men I saw camping at old man Murfree's.

B. G. Kelsey testified: Saw defendant in Mangum, Greer County, after he was arrested. He had a gray team with him. I think I saw this gray team about the 10th or 12th of April, near Turkey Creek, in Greer County. The team I saw near Turkey Creek was a large gray team. They had a dun pony behind the wagon. I crossed the road about sixty or seventy yards in front of the wagon. Only saw one man with the wagon. I have been at the place where both the dead bodies were found. I crossed the road in front of the gray team about four miles south of where the dead body was found in the sand hills.

Thomas Graham testified: I live on Turkey Creek, in Greer County, about ten miles from Mr. Murfree's. Saw a gray team pass Turkey Creek about the middle of April last. Only saw one man with the wagon.

Mrs. Cowell testified: I live about five or six hundred yards north of Turkey Creek, in Greer County, and about two hundred yards from the Quanah road. I saw a gray team pass on the Quanah road about the 10th or 11th of April last. The team stopped and the man got a jug of water at the well. There was a dun pony behind the wagon. I only saw one man in the wagon.

Cross-examined: The wagon had sheet and bows. I was about fifty or sixty yards from the wagon. Don't know whether defendant was the man that got the jug of water or not. There might have been other men in the wagon for all witness knew.

Judge Duke testified: I live in Mangum, Greer County, Texas. Went about the 10th of April to look for dead bodies. We went out because some bloody bedding and a hat had been found. We first went to Mr. Murfree's. We then started south on the Quanah road. In a few hundred yards of Mr. Murfree's we struck a wagon track and two large horse tracks. We followed these tracks three or four miles, when the tracks turned out of the road. We followed it about sixty yards and found a dead body in a gully in the sand hills. The body was covered with sand except the head and face, which were exposed. The tracks turned back into the road, and we followed them three or four miles, when they again turned out of the road and passed within a few feet of where the bloody bedding and hat had been found. They then turned back into the road, and we followed them until dark. Witness then went on to Quanah and then to Vernon, where the defendant had been arrested. Witness measured the horse tracks near Murfree's and measured the tracks of the horses where the dead body was found and where they came back into the road and where the bloody bedding was, and they corresponded. One of the tracks was a very large track and one was fresh shod. Measured the track of the gray horse found in the possession of the defendant. The large track was the same size

of the large track at the dead body, and the other track corresponded with the other track found at the dead body. Witness saw some red striped corn, also oats, at a camp near Murfree's, at the place where the dead body was found and where the bedding had been found. Witness picked up and kept some of the corn found at each of these places. Witness also examined the wagon found in the possession of the defendant and found red striped corn and also oats in the wagon. Witness compared the corn and oats in the wagon with the corn he had picked up as above stated, and it was the same kind and quality of corn and oats. Witness found this same kind of corn all along : the road when they were tracking the horses. Witness found a 32-caliber Winchester shell in the wagon at Vernon. It was the same size of the shell found near the dead body in the ravine on Salt Fork. The country from Murfree's house to where the dead body was found is very sandy. There was a hole in the head of the man found near the road in the sand hills, just above the ear, and appeared to be made with a 32-caliber ball. Witness here identified the black hat that was found with the bedding, and stated that the hole in the hat corresponded exactly with the hole in the head of the dead man when the hat was placed on the head of the man that was found in the sand hills.

Cross-examined: While tracking the horses and wagon from Murfree's house to where the dead body was found we found where several wagons had left the road, but they were going in the opposite direction. We could only follow the track by the track of the horses, as there had been other tracks on the road. We tracked carefully, and the large horse tracks never left the road from the time we found them near Murfree's until they came to the place where the dead body was found. Know where witness Cooper said that the man was lying under the wagon. Didn't examine for any tracks there. The hole found in the back of the man found in the ravine corresponded in size to the hole in the black hat and the hole in the head of the body found in the sand hills. Can't say whether these holes were made with a 32 or a 38-caliber bullet. We found a 32-caliber Winchester in the wagon in defendant's possession in Vernon. The dead bodies were found in Greer County, Texas.

Sam Carter, testified: I live in Vernon, and am deputy city marshal. First saw defendant where I arrested him in the Greer County Wagon Yard in Vernon. He was stopping in a yard owned by Ed Jackson. I did not search him. I found a wagon and three horses in the possession of the defendant—two gray horses and a dun pony. I let the defendant water his horses, after I arrested him, at the well in the Greer County Wagon Yard at Vernon, Texas. After he watered them he went into the wagon yard house to cook his dinner. Britton, the State Ranger, came and told me to take defendant and another young man that was with him outside the wagon yard and hold them

until he came out, and I did so.   I told the defendant when I arrested him that I would have to hold him until I found out who the team he had charge of belonged to.   He said they were not his horses, but belonged to the boys; that they would be in in a day or two.  Did not say who the boys were.   Witness is not sure where defendant said they were, but thought that he said they were at Quanah.

G. W. Patrick testified, that he cleaned out the well in the Greer County Wagon Yard in Vernon, Texas, some six weeks or two months after the defendant had been arrested and placed in jail; that witness was working down in the well and a boy drawing dirt; that the boy found the watch in the dirt drawn from the well; that the witness did not see the watch while down in the well.   Witness was here shown the watch, and identified it as the watch found in the dirt drawn from the well in the Greer County Wagon Yard.

Charles Tuggle testified:   I live at Vernon; lived there in April last. Knew W. E. Roberts and J. M. Moss.   Worked in the brick yard with them; was acquainted with them about seven weeks.   They left in the spring with the defendant for a hunt in Greer County.   They went in a wagon, and had a gray team about sixteen hands high and a dun pony. Roberts owned the wagon and pony and Moss the gray team.   They took a tent and some firearms with them, and Moss and Roberts each owned watches.   Roberts had a good big silver double case watch. [Witness was here shown the watch found in the dirt drawn from the well as identified by witness Patrick.]   Witness said he believed it was the watch owned by Roberts, and was pretty sure that it was the watch. They left on Sunday, and I saw Morris in Vernon the next Monday week, and he told me at that time that Moss had lost his watch at the brick yard and asked me to look for it.

Cross-examined:   Don't know the number of Roberts' watch nor the movements.   There was no particular mark on the watch that witness knew of.   Roberts' watch had a large, long-linked chain when he wore it in the brick yard.   The watch here shown him had no chain.

J. T. Conn, recalled, testified:   After defendant had been taken to Greer County, witness told him that he had found and examined his trunk.   Defendant replied, "You didn't find anything in it but a check."   The trunk referred to was at Mr. Naylor's, where defendant boarded.   Defendant told me himself where his trunk was.   He said it was at Mr. Naylor's, and witness found said trunk at Naylor's, in Vernon, and where defendant boarded.   The witness then produced two large smooth gold rings and a large hunting-case silver watch and a watch chain, and stated that he found them in the tray of the trunk taken at Naylor's.   Witness stated that one of the rings had the letters J. J. neatly engraved on the inside, and the other ring had the letters W. E. roughly scratched on the inside.

Cross-examined: Witness stated that the chain taken from the trunk and produced in court was not what he called a long-linked chain, but was what was known as a twisted-linked chain.

T. S. Camp testified: I live at Vernon; lived there since February last. Knew John M. Moss in Bosque County in the year 1885. Knew him there until 1888, when he moved to Kaufman County. Next saw him in Vernon in the winter of 1890. Moss owned a large smooth gold ring when I knew him in Bosque County. The ring had J. J. engraved on the inside. He also owned a large hunting-case silver watch. The watch and rings taken from the trunk at Naylor's, testified to by Sheriff Conn, were shown him, and witness identified it as the watch owned by Moss. Witness stated that he had a conversation with Moss about three weeks before defendant was arrested in Vernon, Texas; that when they went to part Moss took out his watch, and witness identified it as the same watch that he had carried in Bosque County, and remarked, "John, I see you still keep your old watch." Moss replied, "Yes; I would not give it for any of the new ones now." Witness then examined the two rings, and identified the one with J. J. engraved on it as being the ring owned by Moss in Bosque County; that he had often seen said ring and had had it on his finger. Witness was here shown a large shoe taken from the dead body in the sand hills. Witness stated that he believed it was the same shoe worn by J. M. Moss when he had the conversation above referred to. Witness' attention was called to the shoe at the time by its being new and by its being a large, heavy shoe. Had not seen Moss for two years until I met him in Vernon.

Ross Kerr testified: Live in Margaret, Hardeman County, Texas. Saw defendant in the Greer County Wagon Yard in Vernon, Texas. He came there on a Sunday evening in April last and remained there until he was arrested. Defendant brought with him a gray team and wagon and a dun pony. After the defendant had been in the wagon yard a day or two he asked me how I'd trade my mules for his gray horses. Witness replied that he did not want to trade the mules. Defendant then said, "How will you trade your mules for all three of my horses?" I thought at the time that he was just giving me a gag. I supposed he was joking, because several other parties in the wagon yard had asked me to price the mules, and I had refused to sell them at any price. I said I knew the defendant did not own the horses at the time he offered to trade.

J. C. Summers testified: I live at Vernon. I saw the defendant last spring at Vernon, the same week he was arrested. Defendant said something about trading for a work horse. I offered to trade him a work horse. We went to look at the mare, which was a small dun pony. I asked him $15 to boot; he offered $12.50. We quit that way.

W. E. Hurley testified: I live at Vernon. Remember when the defendant was arrested. Went to the wagon yard to help the party who

had defendant under arrest when they started to Mangum. Saw same red and white corn in the wagon, same 32-caliber Winchester cartridges and a 32-caliber Winchester. Saw blood in the bottom of the wagon. It looked like it had been scoured or wiped up with something.

R. C. Hannah testified: I have been living at Mangum for the last three years. Am a druggist; have been in that business eight or ten years. Have studied medicine and surgery. I went up on Salt Fork to assist in burying a man who had been found dead. This body was in a ravine near Salt Fork. There was a hole through one arm and a hole through the middle of the back. These holes appeared to be about the size of a 32-caliber ball. The right jaw seemed to be blown off and a part of the top of the right shoulder. This man came to his death by a gunshot wound. The face was very much mutilated. The hair was black or dark color. Witness identified the vest in court as the one taken off the dead body. The hole in the back of the dead body went straight in. Could see finger prints of some one in the sand where they pulled in tufts of grass to cover the body.

H. M. Furguson testified: I am a practicing physician; graduated at Missouri Medical College. I live at Mangum, in Greer County. I saw the dead body of a man in a ravine on Salt Fork about fifteen miles west of Mangum, in Greer County, Texas. The body was partly covered up with dirt. The face, left hand, and forearm to the elbow were exposed. The body was considerably decomposed; face mutilated, jaw divided, and one side turned back. Looked like the wound from a shotgun. One arm was broken—a small hole through the arm. There was a small hole in the center of the back. The body must have been dead five or six days.

J. A. Powers, recalled, testified for the defendant: I closely examined the dead body in the ravine. The holes in the back and arm of the dead body were of the same size of the hole in the vest and shirt. The witness was here handed four bullets of different sizes taken from cartridges, and asked if he could tell the caliber of the different balls. Witness answered that he could not. The largest ball was then put through the hole of the vest and shirt. Witness stated that the ball hardly filled the hole in the vest and shirt taken from the dead man in the ravine. Witness then identified the black hat found with the bedding, and stated that the hole in the head of the man found in the sand hills was the same size of the hole in the hat. The large ball was then fitted to the hole in the hat. Witness stated that it was too large to go through the hole. The second largest ball was then fitted to the hole, and witness stated it was too large to go through the hole in the hat. The third size ball was then passed through the hole. Witness stated that that ball fitted tighter in the hole in the hat than the largest ball did in the shirt and vest. Witness stated that they carried the defendant to the dead body in the ravine and asked him if it was the

dead body of Roberts. Defendant said it looked like Roberts' body, and exclaimed, "Poor Roberts, how can they think that I would do such a thing." There were some threats of hanging defendant, and defendant thought that he was going to be hanged. As they passed Mr. Murfree's going to the dead body defendant asked Mrs. Murfree to go with them and pray for him, and stated that they were going to hang him. That when they were at the dead body, and after defendant had stated that he did not know whether it was Roberts' body or not, but that it looked like Roberts, a man they called Loco John threw a lariat rope over a limb and let the end fall down by the defendant, and said, "Boys, let's hang him." The defendant said that he was innocent, and turned and knelt down by the root of a cottonwood tree and began to pray.

Cross-examined: I had assured the defendant before we started to the dead body that he would be protected, but at the dead body, if I had been in the defendant's place, I would have thought that my neck would have been broken in less than fifteen minutes.

J. M. Standler testified, that he took the balls shown to the witness Powers from the cartridge; that the balls were 22, 32, 38, and 41 caliber respectively; that the large ball fitted in the hole in the vest and shirt was a 41, and that the ball that fitted in the hole in the hat was a 32, and the two balls that would not go through the hole in the hat were 38 and 41.

Cross-examined: I put a 22-caliber ball through the hole in the hat yesterday in the presence of the District Attorney and William T. Murfree, Jr. I also put a 32-caliber ball to the hole in the hat. Didn't try to put the 38 through.

Ed. Jackson testified: The defendant came to my yard either on Sunday evening or Monday evening about the middle of April last. Witness spoke to defendant about getting work, and he said he did not know that he wanted work until the boys came in from Greer County. Heard him say on the day that he was arrested in my yard that the team belonged to the boys in Greer County. That they would be in in a day or two.

Cross-examined: When the defendant came to my yard he brought a large team of gray horses and a small dun pony. Never heard the defendant try to trade the horses. The wagon in my yard, and brought there by defendant and in possession of defendant, had the sheet tied down close; had two trunks, together with various other things.

Wilburne Barrett testified: I live in Vernon. Am acquainted with the defendant and know when he was arrested. Heard him say two days before he was arrested that the gray team and wagon belonged to J. M. Moss and W. E. Roberts. Said that Moss and Roberts were in Greer County, and that he would look for them back in a few days.

Cross-examined: Moss and Roberts never came back that I know of. Had this conversation with defendant on the street in Vernon. Was acquainted with the defendant.

Defendant here rested his case.

E. R. Fletcher for the State, in rebuttal, testified: Defendant told me as they were carrying him from Vernon to Mangum that he and W. E. Roberts and J. M. Moss had pooled to fence a section of land in Greer County, and that Roberts had told him to trade the dun pony and give himself credit for it; that Roberts owed defendant $45; also afterward said that he had a $70 check that belonged to Roberts in his trunk; that Roberts told him that he could cash the check and pay himself out of that, and to keep the rest of the money until they came back. This conversation was had after witness told defendant that they had found defendant's trunk.

C. C. Carson testified: Moss was a large man, about six feet high, weighing about 200 pounds. Roberts was about five feet eight inches high, spare made, and would weigh about 135 pounds; had black hair and a black mustache, and was about 23 or 24 years old. Moss had dark hair and sandy whiskers, and was about 30 years old, and wore ducking pants, and Roberts wore a white hat and Moss a black hat.

Cross-examined: Roberts and Moss worked for me all through February and March. Moss quit the 29th of March and Roberts worked a day or two longer.

—— Camp testified, that he saw J. M. Moss in Vernon the last days of March. J. M. Moss was a large man, about six feet or six feet one inch high, and weighed about 200 pounds. When I last saw him I noticed his vest particularly; that he wore ducking pants, a black hat, and heavy shoes laced in front. The hat found with the bedding on the Quanah road was shown witness, and he said he thought that was the hat worn by Moss when he last saw him. The shoe taken from the body of the large man in the sand hills was shown him, and he said, "That's the shoe worn by Moss when I last saw him." The ducking pants taken from the body were shown him, and he said that Moss had on the same kind of pants when he last saw him. Didn't know that it was the same shoe Moss had on, but that it was the same kind of a shoe.

Charley Tuggle testified: The clothes that were identified as the clothes taken from the dead man in the sand hills were shown witness, and he stated that they were the same kind of clothes and looked like the same clothes worn by Moss when he last saw him. Also examined the hat found with the bedding, and said it looked like the hat worn by Moss when he last saw him. Examined the white hat found near the body of the dead man in the ravine, and said that it was the hat worn by Roberts when he last saw him, when he started to Greer County with the defendant. Described Roberts as being a man about 25 years old, about five feet seven or eight inches high, spare made, and weighed

about 135 pounds.   That Moss was about six feet high and weighed about 180 pounds and was 22 or 23 years old.   Described the color of the hair and mustache.   The witness was shown the watch chain taken from the trunk at Naylor's by J. T. Conn, and said that it was the chain worn by Roberts.   Said the chain worn by Roberts had a knob on the end the same as the chain he was examining, and had a broken hitch the same as this one.

Judge Duke testified:   The body found in the sand hills was about six feet high, would weigh about 200 pounds, was 25 or 30 years old. The body found in the ravine on Salt Fork was about five feet six or seven inches high, and would weigh about 135 or 140 pounds, and was 26 or 27 years old.   The face was mutilated.   Had dark hair and mustache.   I am not an expert in telling ages of dead men.

No brief for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—This appeal is from a judgment of conviction in the court below for murder in the first degree, the penalty being assessed at death.

There are twenty-two bills of exception contained in the record, and the same are here assigned as errors for which the cause should be reversed upon this appeal.   We will notice the second bill of exceptions first.   This bill complains that after the jury had been impanelled and sworn to try the cause the court suspended the proceedings before the jury in order to have the defendant arraigned, he not having been arraigned prior to that time.   In the order of proceedings in a capital case the code of procedure does not prescribe the exact time at which a defendant shall be arraigned.   Code Crim. Proc., arts. 508–512.   It has been held, however, that the arraignment should precede the trial proper, but it is also well settled that a conviction will not be set aside on appeal because the record shows an arraignment at an improper time.   Cordova v. The State, 6 Texas Ct. App., 207; Willson's Crim. Stats., sec. 2108.   No material error is shown in the matter as presented here.

The first bill of exceptions is with reference to the ruling of the court as to the competency of the juror Odell.   With regard to this, the explanation of the trial judge shows that the objections urged are not well taken under repeated decisions of this court.   Steagald v. The State, 22 Texas Ct. App., 464, and authorities there cited.

By defendant's third bill of exceptions it is shown that the court overruled the objection of defendant to witness Powers, on redirect examination by the State, testifying as to the condition of the body found in the ravine and the character of the wounds upon it.   This

testimony was objected to, because the same was not in rebuttal of anything that was drawn out by the defendant on cross-examination, and because the witness had not qualified himself as an expert as to the character and effect of such wounds. The witness stated that the body was in an advanced state of decomposition, that the left jaw was blown off and torn back as if it had been shot with a shotgun, and that the wound in the jaw had the appearance of being made with a shotgun, while the wound in the back had the appearance of being made with a 32 Winchester bullet. The rule which confines the cross-examination of a witness to questions propounded on examination in chief, or in rebuttal to his cross-examination, does not exist in Texas. Rhine v. Blake, 59 Texas, 240. And besides, the common law rule with regard to the examination of witnesses is practically and entirely abrogated in effect by that provision of the Code of Criminal Procedure which expressly declares that the court shall allow testimony to be introduced at any time before the argument of a case is concluded, if it appear that it is necessary to a true administration of justice. Code Crim. Proc., art. 661; Willson's Crim. Stats., sec. 2312. The exercise of such discretion by the trial court will not be revised unless it plainly appears to have been abused. No error is shown in so far as it was objected that the testimony was not in rebuttal is concerned.

As to the objection that the witness did not qualify himself as an expert, the matters about which he testified were not matters of skill demanding the testimony of an expert. It does not require an expert to tell that a human body is in an advanced state of decomposition, nor that the wound had the appearance of having been made with a shotgun or with a Winchester bullet, where it is shown that the witness is familiar with shotguns and Winchesters.

Defendant's fifth bill of exception was to the court's permitting one Byers, a witness for the State, to testify to the finding and giving a description of another dead body discovered several miles from the dead body of Roberts, the deceased involved in this case. The explanation of the learned trial judge to this bill is that he admitted this testimony for the purpose of identifying said body as that of one Moss, who had been a traveling companion of the deceased Roberts and the defendant, and who had disappeared at the same time that deceased Roberts disappeared. The testimony was admissible for the purpose of showing the motive, knowledge, and intent on the part of this defendant, and also as a circumstance developing the *res gestæ* of the transaction under investigation. Willson's Crim. Stats., sec. 2496; Moore v. The State, 28 Texas Ct. App., 377; Barton v. The State, Id., 483; Blackwell v. The State, 29 Texas Ct. App., 195. The learned trial judge in his charge limited and restricted the objects and purposes for which this testimony was adduced and for which it alone could be legitimately considered by the jury.

Defendant's seventh bill of exception was taken to the admission, over his objection, of the testimony of one Patrick about the finding of a watch in a well that he was cleaning out in the town of Vernon, which watch was found some months after the arrest of defendant upon this charge of murder. This testimony was legitimate in the light of the other evidence in the case. It was shown that the defendant on the day of his arrest was stopping at the wagon yard in Vernon in which this well was, and after he had been notified of the suspicion resting against him for the murder of these parties he was permitted to go about the well and water his horses therefrom. The watch found in the well was identified as the property of the deceased.

Defendant's tenth and thirteenth bills of exception relate to a certain letter found upon the defendant after his arrest, which letter purported to be from the deceased Roberts to the defendant, asking him to take care of his (deceased's) property. The court properly admitted this testimony as a fact going to show defendant's guilt. The letter was identified as the one taken from the defendant, and was proved to be in the handwriting of the defendant himself by a witness who had seen him write and was familiar with his handwriting.

Defendant's eleventh and sixteenth bills of exception complain of the admission by the court of the testimony of a watch, ring, and other contents of a trunk, which trunk had been in possession of the defendant and was found in his room at his boarding house after his arrest. The articles taken from the trunk and permitted by the court to be produced in evidence were identified and proved to be the property of the deceased Roberts and his companion Moss, who had also been killed at the same time and near the same place where Roberts was killed. This evidence was legitimate as tending to show motive (robbery), fruits of the crime in defendant's possession, and form links in the chain of circumstances going to establish defendant's guilt.

The seventeenth, eighteenth, nineteenth, twentieth, and twenty-first bills of exception are complaints with reference to the service of a copy of the venire, the sheriff's amendment of his return on the venire, and matters pertaining to the motions and counter-motions made by the defendant and the State with regard to the proceedings antecedent to the entry of a final judgment *nunc pro tunc.* These bills show no intrinsic merit, and are fully explained where they appear at all to have merit by the learned trial judge.

We have considered all the questions raised upon this appeal, and have found no matter of sufficient importance to require the reversal of the verdict and judgment rendered.

The evidence shows that this defendant went off upon a hunt with Roberts and Moss from Hardeman to Greer County, and that in Greer County he murdered both of his companions—murdered them for the purpose of obtaining possession of the horses and wagon and other

property which belonged to them. The evidence is circumstantial in character, but it is most cogent and conclusive, and no fair minded, dispassionate judgment passing upon it as it appears in this record could arrive at any other conclusion than that this defendant was the guilty agent who perpetrated the foul murder, for which he has had a fair trial and been legally and justly convicted.

The judgment is affirmed.

*Affirmed.*

Davidson, J., being disqualified, did not sit in this case.